UNITED STATES of America
v.
George I. WITKOVICH, also known as Juri Isador Wotkovich.

No. 55 Cr 607.

United States District Court
N. D. Illinois, E. D.

Feb. 15, 1956.

Supplemental Opinion May 10, 1956.

R. Teicken, U. S. Atty., Chicago, Ill., for the United States.

Pearl Hart, Chicago, Ill., for defendant.

SULLIVAN, District Judge.

This is an indictment under Title 8 U.S.C.A. § 1252(d), which reads:

"(d) Any alien, against whom a final order of deportation as defined in subsection (c) of this section, heretofore or hereafter issued has been outstanding for more than six months, shall, pending eventual deportation, be subject to supervision under regulations prescribed by the Attorney General. Such regulations shall include provisions which will require any alien subject to supervision (1) to appear from time to time before an immigration officer for identification; (2) to submit, if necessary, to medical and psychiatric examination at the expense of the United States; (3) *to give information under oath as to his nationality, circumstances, habits, associations, and activities,* and *such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper;* and (4) to conform to such reasonable written restrictions on his conduct or activities as are prescribed by the Attorney General in his case. Any alien who shall willfully fail to comply with such regulations, or *willfully fail to* appear or to *give information* or submit to medical or psychiatric examination if required, or knowingly give false information in relation to the requirements of such regulations, or knowingly violate a reasonable restriction imposed upon his conduct or activity, shall upon conviction be *guilty of a felony,* and shall be fined not more than $1,000 or shall be imprisoned not more than one year, or both." (Italics added.)

A motion to dismiss the indictment, attacking the constitutionality of the statute, is now before the court. The charge is that defendant violated clause (3), italicized above, in that he wilfully failed to answer certain questions which are set forth in the indictment. There is no allegation that he refused to appear, to submit to a medical or psychiatric examination, or to submit to reasonable restrictions on his conduct; these requirements are not, therefore, directly involved, although incidental consideration of them is necessary.

The parties agree that this Act is an exercise by Congress of the power of the United States as a sovereign state to deal with aliens within its territory, Carlson v. Landon, 1952, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547; United States v. Tandaric, 7 Cir., 1946, 152 F.2d 3, 5, certiorari denied 327 U.S. 786, 66 S.Ct. 703, 90 L.Ed. 1012. To be upheld, it must constitute a valid delegation of that power to the Attorney General, in terms definite enough to form a standard of guidance for his conduct. Winters v. New York, 1947, 333 U.S. 507, 515, 68 S.Ct. 665, 92 L.Ed. 840; Lichter v. United States, 1948, 334 U.S. 742, 786, 68 S.Ct. 1294, 92 L.Ed. 1694. Whether it does or not can be determined only by an examination of the section in its context: Title 8 U.S.C.A. § 1251 et seq., and the cases which have interpreted those sections. Section 1251 provides that any alien in the United States shall be deported upon the order of the Attorney General for causes there set forth; section 1252(b) prescribes the procedure for the entry of such an order. Pending determination of deportability, an alien may in the discretion of the Attorney General be continued in custody, or released on bond or conditional parole, section 1252(a). The Attorney General's discretion under this section is not unlimited, but may be reviewed by the courts to determine whether he acted reasonably. United States ex rel. Belfrage v. Shaughnessy, 2 Cir., 1954, 212 F.2d 128; U. S. ex rel. Hyndman v. Holton, 7 Cir., 1953, 205 F.2d 228, 230; Ocon v. Landon, 9 Cir., 1954, 218 F.2d 320, 324. After the entry of a final deportation order, the Attorney

General is given six months within which to "effect the alien's departure", during which the alien may be detained or released on bond. Section 1252(c). The alien must be released from detention sooner than six months if it appears that there is no reasonable possibility of his being deported in the foreseeable future. United States ex rel. Kusman v. District Director of Immigration, D.C. S.D.N.Y.1953, 117 F.Supp. 541; United States ex rel. Cefalu v. Shaughnessy, D. C.S.D.N.Y.1954, 117 F.Supp. 473. Although this subsection provides that after the six-months period, if deportation has not been effected, the alien "shall become subject to such further supervision and detention pending eventual deportation as is authorized in this section", it has been held that "and detention" is surplusage, the period of detention must terminate after six months, and the alien thereafter be subject only to such detention as may result from a violation of the supervision provisions of subsection (d) (3). United States ex rel. Youw v. Shaughnessy, D.C.S.D.N.Y. 1952, 102 F.Supp. 799, 801; United States ex rel. Blankenstein, D.C.S.D.N.Y. 1953, 117 F.Supp. 699. The last-named section is the one here considered, and has been quoted in full; the regulations are in substantially the language of the statute. Subsection (2) provides that wilfull refusal or failure to depart after an immigration order is final shall be a felony; section 1253 relates to the countries to which the Attorney General shall deport the aliens.

It is apparent from this summary of the deportation procedure that after the entry of a final order of deportation, the sole remaining power and duty of the Attorney General is to make sure that the alien departs from the country. It follows that the powers of supervision given him are intended as an aid in enforcing this power by making certain that the alien will be available for deportation when and if the time comes that this is possible. Clauses (1), (2), and (4) of the same subsection are reasonably calculated to fulfill this purpose. Clause (1), requiring the alien to submit himself for identification, is clearly helpful to that end; the requirement of physical examinations might be necessary to deportation to a particular country; and in (4), "to conform to such reasonable written restrictions on his conduct or activities as are prescribed by the Attorney General in his case", the word "reasonable" may be read as "those restrictions which tend to guarantee his availability for deportation." The same may be said of clause (3), of immediate concern here: "to give information * * * as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper." This must be read to mean such information as is necessary to enable the Attorney General to be certain that the alien is holding himself in readiness to answer the call to be deported when it comes.

The Government urges that the Attorney General may, under this section, question the alien to determine not only his availability for deportation, but also to satisfy himself that the activities for which the alien was ordered deported are not continuing. There is no warrant for such an interpretation, since the Attorney General is powerless to take any further action even if they are continuing. A deportation order is not a magic incantation, but a finding that the alien is, for one reason or another, an undesirable resident of this country. Further, it is an order entered in a civil proceeding, in which proof is by "clear and convincing" evidence, rather than beyond a reasonable doubt. United States ex rel. Vajtauer v. Commissioner, 272 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560, in which counsel need not be appointed, United States v. Vander Jagt, D.C.W.D.Mich.1955, 135 F.Supp. 676, and hearsay evidence may be admitted. Navarrette-Navarrette v. Landon, 9 Cir., 1955, 223 F.2d 234.

■ There is accordingly no justification for allowing a deportation order to accomplish more than its intended purpose. It establishes, in a hearing adequate for this end, that the alien shall depart this country and nothing more. The Attorney General has been given power to supervise the alien to make sure he is available for deportation, and no further power. If, after the entry of the order, the alien engages in activity punishable under the Criminal Code, the Attorney General is at liberty to bring him before a Grand Jury and move for an indictment in the usual way. If he is not engaging in such activity, and if it is physically impossible to deport him, and if increasing numbers of aliens in this situation has created a serious problem, then Congress may solve it by giving some official definite and measurable power to deal with the dilemma. So far it has not done so, except to the extent that it has given the Attorney General the powers of supervision here considered.

This discussion has dealt with most of the objections urged by the defendant. He also urges that the statute creates a crime by legislative fiat, leaving the court nothing to do but to pronounce sentence in a summary proceeding, Wong Wing v. United States, 1896, 163 U.S. 228, 236, 16 S.Ct. 977, 41 L.Ed. 140, and that procedural due process has been violated. That is not the case when the statute is correctly interpreted. The court will determine the relevancy of the questions by a definite standard: do they assist the Attorney General in making certain that the alien will be available for deportation?

■ Defendant also contends that the statute here considered violates the First Amendment guarantee of freedom of speech of which freedom of silence has been assumed to be a part. United States v. O'Connor, D.C.1951, 135 F. Supp. 590, at page 596, and cases cited. However, speech may be compelled by Congress, and silence punished, when special circumstances warrant restrictions on traditional freedoms. Thus Title 2 U.S.C.A. § 192 making it an offense punishable by fine or imprisonment to fail to answer proper questions asked by Congressional committees has been upheld. In re Chapman, 1896, 166 U.S. 661, 672, 17 S.Ct. 677, 41 L.Ed. 1154; United States v. Bryan, 1949, 339 U.S. 323, 327, 70 S.Ct. 724, 94 L.Ed. 884. Under this statute, however, questions must be relevant to the Congressional power to legislate, Quinn v. United States, 1955, 349 U.S. 155, 162, 75 S.Ct. 668, 99 L.Ed. 964; just as in the instant case they must relate to the valid power of the Attorney General.

The motion to dismiss the indictment is overruled.

### Supplemental Opinion

After the announcement of the foregoing opinion, new motions and briefs were filed by both parties.

■ Defendant filed a "Supplemental Motion to Dismiss Indictment." His argument in support of this motion in part reiterates objections previously considered by the court. He contends that the indictment is vague and uncertain in that it fails to set forth the order of deportation, the authority by which, or the sections under which it was made, or that the defendant had notice of it. These objections must be overruled. The indictment is in the language of the statute and sufficiently notifies the defendant of the charge which he must meet. Several other objections urged were dealt with in the original memorandum, but have been re-considered, and are overruled. The Court adheres to its original opinion that the statute, as construed, is not unconstitutional.

■ The government's brief in answer to this Supplemental Motion to Dismiss is devoted to the presentation of additional material in support of its original contention that the statute gives the Attorney General power to question a deportable alien about matters other than his availability for deportation. This additional information has been

carefully considered and found not to be convincing. The theme of the government's argument appears to be that to let deportable aliens roam the country unsupervised would create a very dangerous situation. The Court is of the same opinion. As the previous memorandum indicated, Congress quite correctly gave the Attorney General power to make certain of the alien's whereabouts at all times. To this end, under the statute here considered, the Attorney General could properly ask, and enforce his right to receive answers to, questions as to the alien's place of residence, whether he owns his home or rents, where he works and how long he has worked there, whether he is married and lives with his wife, and an endless list of inquiries along the same line. This power is quite sufficient to ensure that the alien will not be without supervision. To hold that the statute intended to give an official the unlimited right to subject a man to criminal penalties for failure to answer absolutely any question the official may decide to ask would raise very serious constitutional questions. The Court accordingly reiterates that the power given to the Attorney General by the statute in question is to enforce his right to question a deportable alien to make certain that the latter is holding himself available for deportation.

■■■■■■■, The defendant's motion asks that the Court now examine the questions set forth in the indictment, and dismiss the indictment for the reason that it is apparent that none of them is related to his availability for deportation. Although there is no authority under this particular section, such a procedure is dictated by analogous situations in other fields. Thus it is the duty of the judge to rule on whether or not the privilege against self-incrimination has been properly claimed, and "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result", Hoffman v. United States, 1950, 341 U.S. 479, 489, 71 S.Ct. 814, 818, 95 L.Ed. 1118; quoted, Emspak v. United States, 1954, 349 U.S. 190, 199, 75 S.Ct. 687, 99 L.Ed. 997. And in a prosecution for perjury, it is clear that the materiality of the questions asked is a question of law for the court, Sinclair v. United States, 1929, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692; United States v. Orman, 3 Cir., 1953, 207 F.2d 148, 155, and that materiality "should appear on the face of the indictment", Markham v. United States, 1895, 160 U.S. 319, 325, 16 S. Ct. 288, 291, 40 L.Ed. 441. Where the questions are not relevant on their face, but there is any probability that they could be shown to be relevant, it is proper to give the government an opportunity to make some sort of showing on the question. Bowers v. United States, 1953, 92 U.S.App.D.C. 79, 202 F. 2d 447, 449; United States v. Orman, supra. However, where it appears from the indictment that the questions alleged are not even probably material, the indictment should be dismissed. United States v. Garvett, D.C.E.D.Mich.1940, 35 F.Supp. 644, 646; United States v. Seymour, D.C.Neb.1931, 50 F.2d 930, 940; United States v. Cameron, D.C.Ariz. 1922, 282 F. 684, 692. Where it is perfectly apparent to the trial judge from the face of the indictment that the questions set forth are irrelevant, the defendant will not be exposed to what would be a "mere ceremony of trial". United States v. Laut, D.C.S.D.N.Y. 1955, 17 F.R.D. 31, 36.

In the present case, the government apparently agrees that a ruling on the questions now is the proper procedure in this case. In its brief in opposition to the motion to dismiss, it has not urged that the questions were relevant, but has confined itself to urging the court to reverse its previous position. Further, in a "Motion for Clarification" of the Court's previous memorandum, it has

prayed "that the Court rule on the legality of the questions asked."

■ The law in analogous situations, reason, and the explicit request of both the government and defendant, thus dictate that I examine the questions set forth in the indictment. This examination is for the purpose of determining whether they are (a) clearly relevant, (b) possibly relevant, or (c) clearly irrelevant, to the matter of assisting the Attorney General to make certain that the alien is available for deportation.

Of the twenty-two questions on which the indictment is based, many are so far afield as to require no discussion, since it is apparent at a glance that they are in no way relevant to this purpose. These are as follows:

"Can you read in any other language than Slovene and English?"

"Have you attended any meeting of any organization other than the singing club?"

"Have you addressed any lodges of the Slovene National Benefit Society seeking aid for you, in your behalf, in your deportation case * * * ?"

"Have you distributed petitions or leaflets published by the (above) Society seeking aid for you, in your behalf * * * ?"

"Since the order of supervision have you attended any meetings or lectures at the Peoples Auditorium * * * ?"

" * * * Have you attended any meetings or socials at the Chopin Cultural Center * * * ?"

"Have you attended any movies * * * at the Cinema Annex?"

"Are you now or have you ever been a member of the Slovene American National Council?"

"Are you now or have you ever been a member of the United Committee of the South Slavic Americans?"

There is no allegation which would shed any light on how these activities would in any way affect the probability of the alien's presenting himself to immigration officials when required to do so. The questions by themselves are completely meaningless in this context.

■ The same may be said of ten other questions, eight of which are "Do you know John Doe?", and two "Have you visited the office of John Doe?" "We seriously doubt whether the 'Do-you-know-a-certain-person' question, without more, can ever be said to be pertinent for the purposes of a criminal prosecution under § 192." Bowers v. United States, supra, 202 F.2d 447, at page 452; see also United States v. Aiuppa, D.C.N.D.Ohio 1950, 102 F.Supp. 609, 613.

■ The first question in the indictment is "Do you subscribe to the Daily Worker?" Quite aside from its obvious irrelevancy to availability for deportation, to subject a man to criminal penalties for failure to answer a question as to what he reads would be an apparent infringement of rights protected by the First Amendment.

The remaining two questions are "Have you attended any meetings of the Communist Party of the U.S.A.?", and "Are you now a member of the Communist Party of the U.S.A.?" It is apparent that an affirmative answer to this question would not indicate anything about whether or not the defendant was holding himself in readiness for deportation. Directly in point are the many cases which have held that whether or not a person is a member of the Communist Party, by itself, has no relationship to his fitness to be admitted to bail. The leading case is Stack v. Boyle, 1951, 342 U.S. 1, 5, 72 S.Ct. 1, 4, 96 L. Ed. 3, in which the Court considered a motion for reduction of bail by persons indicted under the Smith Act, 18 U.S. C.A. § 2385. The only evidence offered by the Government was a showing that four persons previously convicted under

that Act had forfeited bail. The Court found such a showing insufficient, remarking that "the fixing of bail for any individual defendant must be based upon *standards relevant* to the purpose of *assuring the presence of that defendant.*" (Italics added.)

A similar holding in Christoffel v. United States, 1952, 89 U.S.App.D.C. 341, 196 F.2d 560, 567 is explained in the following quotation:

> "The Government urges that the fact that Christoffel is a Communist and is active in party affairs renders unlikely his appearance when required to appear. * * * Moreover, even if it be assumed that (he) is a Communist and is actively engaged in Communist party affairs, this, without more, is not a proper ground for denial of bail. * * * In the instant case the present primary issue is whether Christoffel will, under the conditions of bail * * * make appearance before the court when required to do so."

The opinion then quotes from another bail case which reached the same result on the same reasoning, Williamson v. United States, 2 Cir., 1950, 184 F.2d 280, 284:

> " 'But the right of every American to equal treatment before the law is wrapped up in the same constitutional bundle with those of these Communists. If in anger or disgust with these defendants we throw out the bundle, we also cast aside protection for the liberties of more worthy critics who may be in opposition to the government of some future day.' "

Another authority to the same effect is United States ex rel. Pirinsky v. Shaughnessy, 2 Cir., 1950, 177 F.2d 708.

Accordingly, while the defendant's contention that the Act is unconstitutional is overruled, the indictment will be dismissed for the reason that none of the questions there set forth is relevant to defendant's availability to deportation.