## UNITED STATES *v.* WITKOVICH.

No. 295.  Argued February 28, 1957.—Decided April 29, 1957.

*John F. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Olney, Beatrice Rosenberg* and *J. F. Bishop.*

*Pearl M. Hart* argued the cause for appellee.  With her on the brief was *Cyril D. Robinson.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Appellee was indicted under § 242 (d) of the Immigration and Nationality Act of 1952, 66 Stat. 163, 208, originally part of § 23 of the Internal Security Act of 1950, 64 Stat. 1010, on the charge that, as an alien against whom a final order of deportation had been outstanding

for more than six months, he had wilfully failed to give information to the Immigration and Naturalization Service as required by that section. Appellee moved to dismiss the indictment on the grounds, *inter alia*, that it failed to state an offense within the statute and in the alternative, if it did so, that the statute was unconstitutional. The District Court held that the statute as construed by it was not unconstitutional. 140 F. Supp. 815. Thereupon the United States filed a motion for clarification of the court's opinion, and appellee filed a supplemental motion to dismiss the indictment, claiming that the statute as construed by the district judge did not authorize the Government to elicit the demanded information. The District Court, in a second opinion, dismissed the indictment for failure to state an offense. 140 F. Supp., at 820. The case was brought here, 352 U. S. 817, under the Criminal Appeals Act of 1907, as amended, 18 U. S. C. § 3731.

The Section, as amended, 68 Stat. 1232, 8 U. S. C. (Supp. II) § 1252 (d), is as follows:

"(d) Any alien, against whom a final order of deportation as defined in subsection (c) heretofore or hereafter issued has been outstanding for more than six months, shall, pending eventual deportation, be subject to supervision under regulations prescribed by the Attorney General. Such regulations shall include provisions which will require any alien subject to supervision (1) to appear from time to time before an immigration officer for identification; (2) to submit, if necessary, to medical and psychiatric examination at the expense of the United States; (3) to give information under oath as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper; and (4) to conform to such

reasonable written restrictions on his conduct or activities as are prescribed by the Attorney General in his case. Any alien who shall willfully fail to comply with such regulations, or willfully fail to appear or to give information or submit to medical or psychiatric examination if required, or knowingly give false information in relation to the requirements of such regulations, or knowingly violate a reasonable restriction imposed upon his conduct or activity, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

The District Court construed § 242 (d) as conferring upon the Attorney General "power to supervise the alien to make sure he is available for deportation, and no further power." Accordingly, it held that clause (3) of this subsection is to be restricted to require only "such information as is necessary to enable the Attorney General to be certain that the alien is holding himself in readiness to answer the call to be deported when it comes." 140 F. Supp., at 819–820. The court found that the questions listed in the indictment, which are set forth in the margin,* were not relevant to appellee's availability for depor-

---

* "(a) Q. Do you subscribe to the Daily Worker?

"(b) Q. Mr. Witkovich, can you read in any other language other than Slovene and English?

"(c) Q. Since the order of supervision was entered on March 4, 1954, have you at any time visited the office of the 'Narodny Glasnik,' 1413 West 18th Street, Chicago, Illinois?

"(d) Q. Since the order of supervision was entered on March 4, 1954, Mr. Witkovich, have you ever visited the offices of the Bohemian publication 'Nova Dova' or the Slovakian publication 'Ludovy Noviny,' 1510 West 18th Street, Chicago, Illinois?

"(e) Q. Do you know the editor of the 'Narodni Glasnik'?

"(f) Q. Do you know Leo Fisher?

"(g) Q. Do you know Anton Minerich?

"(h) Q. Do you know Nick Rajkovich?

tation. The interpretation that the District Court thus placed on § 242 (d) was derived from a consideration of its relation to the entire statutory scheme of deportation of which it is a part. The court below was further guided by the principle that requires courts, when construing statutes, to avoid constitutional doubts. "To hold that the statute intended to give an official the unlimited right to

"(i) Q. Do you know Arsenio Bartl?

"(j) Q. Do you know John Zuskar?

"(k) Q. Do you know Calvin Brook?

"(l) Q. Since the order of deportation was entered in your case on June 25, 1953 have you attended any meeting of the Communist Party of the U. S. A.?

"(m) Q. Since the order of supervision was entered on March 4, 1954 have you attended any meeting of any organization other than the singing club?

"(n) Q. Have you addressed any lodges of the Slovene National Benefit Society requesting their aid in your case, since the order of deportation was entered June 25, 1953?

"(o) Q. Have you distributed petitions or leaflets published by the Slovene National Benefit Society seeking aid for you, in your behalf, in your deportation case since the order of deportation was entered June 25, 1953?

"(p) Q. Since the order of supervision have you attended any meetings or lectures at the Peoples Auditorium, 2457 West Chicago Avenue, Chicago, Illinois?

"(q) Q. Since the order of supervision was entered against you have you attended any meetings or socials at the Chopin Cultural Center, 1547 North Leavitt Street, Chicago?

"(r) Q. Have you attended any movies since your order of supervision was entered at the Cinema Annex, 3210 West Madison Street, Chicago?

"(s) Q. Are you acquainted with an individual named Irving Franklin?

"(t) Q. Are you now a member of the Communist Party of U. S. A.?

"(u) Q. Are you now or have you ever been a member of the Slovene American National Council?

"(v) Q. Are you now or have you ever been a member of the United Committee of South Slavic Americans?"

subject a man to criminal penalties for failure to answer absolutely any question the official may decide to ask would raise very serious constitutional questions." *Id.,* at 821.

The Government does not support the questions put to the alien on the basis of the construction that the District Court placed upon § 242 (d). This construction authorizes all questions reasonably appropriate to keep the Attorney General advised regarding the continued availability for departure of a deportable alien. The Government contends that the District Court misconceived the scope of the statute. It points to what it characterizes as "the eloquent breadth" of clause (3), whereby the alien is to give "such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper." This, says the Government, establishes a requirement "in the broadest possible statutory terms for the furnishing of information by the alien." And this view, it maintains, fits into the statutory scheme. In the circumstances defined by § 242 (a), an alien may be detained pending determination of deportability; and § 242 (c) authorizes such detention for six months after the alien has been found deportable. So, the Government argues, § 242 (d), though it does not authorize detention after six months, is an attempt to accomplish in a modified form the ends that would justify detention in the earlier stages of the deportation process. Our decision in *Carlson* v. *Landon,* 342 U. S. 524, is heavily invoked. If, so the argument runs, detention of active alien Communists pending deportation hearings was sustainable under § 242 (a), the national interest in avoiding recurrence of past Communist activity for which appellee is being deported should at least require him to answer questions regarding any present Communist relationships. For this view of the purpose of supervision, support is found in two other statutory provisions:

§ 242 (e), making an alien's wilful failure to leave the country a felony but providing for suspension of sentence and release of the alien upon judicial consideration, *inter alia,* of the effect of release upon the national security and the likelihood of resumption of conduct that serves as a basis for deportation; and the recital in § 2 (13) of the Internal Security Act of 1950, that "numerous aliens who have been found to be deportable, many of whom are in the subversive, criminal, or immoral classes . . . are free to roam the country at will without supervision or control." 64 Stat. 987.

The language of § 242 (d)(3), if read in isolation and literally, appears to confer upon the Attorney General unbounded authority to require whatever information he deems desirable of aliens whose deportation has not been effected within six months after it has been commanded. The Government itself shrinks from standing on the breadth of these words. But once the tyranny of literalness is rejected, all relevant considerations for giving a rational content to the words become operative. A restrictive meaning for what appear to be plain words may be indicated by the Act as a whole, by the persuasive gloss of legislative history or by the rule of constitutional adjudication, relied on by the District Court, that such a restrictive meaning must be given if a broader meaning would generate constitutional doubts.

The preoccupation of the entire subsection of which clause (3) is a part is certainly with availability for deportation. Clause (1) requires the alien's periodic appearance for the purpose of identification, and clause (2) dealing with medical and psychiatric examination, when necessary, clearly is directed to the same end; and the "reasonable written restrictions on [the alien's] conduct or activities" authorized by clause (4) have an implied scope to be gathered from the subject matter, *i. e.,* the object of the statute as a whole. Moreover, this limi-

tation of "reasonableness" imposed by clause (4) upon the Attorney General's power to restrict suggests that, if we are to harmonize the various provisions of the section, the same limitation must also be read into the Attorney General's seemingly limitless power to question under clause (3). For, assuredly, Congress did not authorize that official to elicit information that could not serve as a basis for confining an alien's activities. Nowhere in § 242 (d) is there any suggestion of a power of broad supervision like unto that over a probationer. When Congress did want to deal with the far-flung interest of national security or the general undesirable conduct of aliens, it gave clear indication of this purpose, as in § 242 (e). In providing for the release of aliens convicted of wilful failure to depart, that subsection specifically requires courts to inquire into both the effect of the alien's release upon national security and the likelihood of his continued undesirable conduct.

The legislative history likewise counsels confinement of the mere words to the general purpose of the legislative scheme of which clause (d) is a part, namely, the actual deportation of certain undesirable classes of aliens. Section 242 (d), as it was reported by the House Judiciary Committee and passed by the House in 1949, was in its present state in all but one significant respect. It provided for indefinite detention of any alien who wilfully failed to comply with the regulations, to appear, to give information or to submit to medical examination, or who knowingly gave false information or violated a reasonable restriction upon his activity. H. R. Rep. No. 1192, 81st Cong., 1st Sess., pp. 2–3. The report of the House Committee, although in several places focusing only upon availability for deportation, does indicate concern over the threat to the national interest represented by undesirable but undeportable aliens. The Senate Judiciary Committee, while sharing the desire of the House

to control the activities of such aliens, substituted for the House bill's detention provision the imposition of criminal penalties for failure to comply with the conditions of supervision. The report of the Senate Committee significantly states the reason for the change: "This provision in the bill as it passed the House of Representatives appears to present a constitutional question." S. Rep. No. 2239, 81st Cong., 2d Sess., p. 8. This history, although suggesting a desire to exercise continuing control over the activities as well as the availability of aliens whose deportation had been ordered but not effected, shows a strong congressional unwillingness to enact legislation that may subject the Attorney General's supervisory powers to constitutional challenge.

Acceptance of the interpretation of § 242 (d) urged by the Government would raise doubts as to the statute's validity. By construing the Act to confer power on the Attorney General and his agents to inquire into matters that go beyond assuring an alien's availability for deportation we would, at the very least, open up the question of the extent to which an administrative officer may inhibit deportable aliens from renewing activities that subjected them to deportation. See 70 Harv. L. Rev. 718. This is not *Carlson* v. *Landon, supra,* where the question was whether an alien could be detained during the customarily brief period pending determination of deportability. Contrariwise, and as the Senate and House Committees recognized in passing on § 242 (d), supervision of the undeportable alien may be a lifetime problem. In these circumstances, issues touching liberties that the Constitution safeguards, even for an alien "person," would fairly be raised on the Government's view of the statute.

The path of constitutional concern in this situation is clear.

> "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of

constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson,* 285 U. S. 22, 62.

See also cases cited in the concurring opinion of Mr. Justice Brandeis in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 348, note 8.

Section 242 (d) is part of a legislative scheme designed to govern and to expedite the deportation of undesirable aliens, and clause (3) must be placed in the context of that scheme. As the District Court held and as our own examination of the Act confirms, it is a permissible and therefore an appropriate construction to limit the statute to authorizing all questions reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue. Accordingly, the judgment of the District Court is

*Affirmed.*

Mr. Justice Whittaker took no part in the consideration or decision of this case.

Mr. Justice Clark, with whom Mr. Justice Burton joins, dissenting.

The Congress has authorized the Attorney General to retain an alien in custody during the pendency of deportation proceedings. 66 Stat. 208, 8 U. S. C. § 1252 (a). This Court approved such custody in *Carlson* v. *Landon,* 342 U. S. 524 (1952). The Congress has also authorized the Attorney General to retain an alien in custody for six months subsequent to a final order of deportation within which to "effect the alien's departure." 66 Stat. 210, 8 U. S. C. § 1252 (c). The section here in question further declares that an alien under a final order of

deportation for over six months "shall, pending eventual deportation, be subject to supervision under regulations prescribed by the Attorney General." 64 Stat. 1011, as amended, 8 U. S. C. (Supp. IV) § 1252 (d). The Attorney General has implemented this provision by a regulation requiring the alien, *inter alia,* to "Give information under oath as to his nationality, circumstances, habits, associations and activities, and other information whether or not related to the foregoing as may be deemed fit and proper." 8 CFR § 242.3 (c)(3). This language was taken from subsection (3) of 8 U. S. C. § 1252 (d), the source of the Attorney General's power of supervision. But today the Court has denied the Attorney General the right to question the deportee in regard to activities in conjunction with the deportee's prior conduct on which the deportation order was based. By its interpretation the Court has deleted the crux of this subsection from the Act and limited this phase of the Attorney General's "supervision" of aliens under final deportation order for over six months solely to interrogation relevant to the availability of the alien for deportation. In this respect the construction places an alien who has been under a final order of deportation for more than six months in a more favorable position than one who is under no order at all. Other aliens are obliged to report to the Attorney General when called upon to do so. Indeed, they must testify or claim their privilege. No privilege was claimed here. The Congress could not have intended the anomalous result reached today, one which is entirely foreign to its over-all plan of control over resident aliens. For the power of the Attorney General over aliens generally see 66 Stat. 223–225, 8 U. S. C. §§ 1301–1306.

The majority reasons that the entire subsection of which clause (3) is a part is preoccupied with an alien's availability for deportation. We believe, however, that "the danger to the public safety of [the alien's] presence

within the community," *United States ex rel. Potash* v. *District Director of Immigration and Naturalization,* 169 F. 2d 747, 751 (1948), was the basis on which the Congress placed this power with the Attorney General. In short, "the alien's anticipated personal conduct . . . [based on his past action] must be considered." See the dissenting opinion in *Carlson* v. *Landon, supra,* at 563–564. And so here, highly relevant to the decision regarding any additional supervision that is to be placed over appellee, or the removal of any prior supervision, is information as to whether he has resumed his past activities in the Communist Party. Yet the Court does not allow inquiry into this and related areas unless it is necessary to determine appellee's availability for deportation. The Attorney General is thereby deprived of this information vital to the exercise of his supervisory duties.

The statute was motivated by national security problems with which the Congress felt impelled to deal. In § 1252 (d) Congress was not concerned with "actual deportation," but with that class of deportees who could not be deported because no country would permit them entrance. It believed that an alien finally ordered deported but who could no longer be held in custody pending eventual effectuation of the order should be under the supervision of the Attorney General. All aliens, regardless of their status, are under some supervision and must answer inquiries in respect to: (1) the date and place of their entry into the United States; (2) the activities in which they have been and intend to be engaged; (3) the length of time they expect to remain in the United States; (4) their police or criminal record, if any; and (5) *such additional matters as may be prescribed.* 66 Stat. 224, 8 U. S. C. § 1304 (a). In addition, all aliens must register [1] and be

---

[1] The alien registration form includes a long series of questions requiring answer under oath by the alien. It covers virtually every type of question involved here, except those directed at whether the

fingerprinted, 66 Stat. 224, 8 U. S. C. § 1302; they must notify the Attorney General of their address annually and any change must be filed within 10 days thereof, 66 Stat. 225, 8 U. S. C. § 1305. Criminal penalties are imposed for willful failure to comply with any of these registration provisions, 66 Stat. 225, 8 U. S. C. § 1306. Congress thought that deportees should have closer supervision than other aliens. As the Court indicated in *Carlson* v. *Landon, supra,* at 538, "aliens arrested for deportation would have opportunities to hurt the United States . . . ." Deportees have a stronger motivation for carrying on subversive activities than other persons and are more likely to adopt old habits, return to old haunts, and resume old activities. Since 1939 Congress had been considering the tightening of controls over such aliens. Even then a bill introduced in Congress referred to "the likelihood of the alien's resuming the course of conduct which made him deportable." H. R. 5643, 76th Cong., 1st Sess.; 84 Cong. Rec. 5179. In the Eighty-first Congress a House Committee declared in comment on its bill which contained a provision similar to that here involved, "The situation has now become so serious . . . that the committee feels that the enactment of legislation of this type is a necessity, not only to the proper administration of the immigration laws, but from the standpoint of the national security of the United States." H. R. Rep. No. 1192, 81st Cong., 1st Sess. 8. Before the presidential veto of the proposed Internal Security Act of 1950, H. R. 9490, 81st Cong., 2d Sess., of which this provision was a part,

---

appellee knew a specific person. One of the questions requires disclosure of the alien's participation in clubs, organizations, or societies; another is directed at any criminal convictions of the alien either in or outside of the United States; still another inquires as to the alien's affiliation or activity in organizations influencing or furthering in any way the political activities, public relations, or public policy of a foreign government.

but to which the President expressed no opposition on constitutional grounds,[2] a substitute bill had been offered in the Senate.[3] This proposal contained the identical language which this Court now reads out of the Act, i. e., requiring the alien to give "information under oath as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper." While this substitute bill was not enacted, the same language was included within the present Act, showing that the section here involved has long been acceptable to all sides. In view of the legislative history of the forerunners of the present provision it is surprising that the Court now reads out of the Act the identical language which has repeatedly been included by the Congress. In so doing the Court deprives the Attorney General of a power of supervision over deportees that he possesses and exercises every day over other aliens not under deportation orders.

The Court takes the position that any construction other than that today adopted "would, at the very least, open up the question of the extent to which an administrative officer may inhibit deportable aliens from renewing activities that subjected them to deportation." But no such question is involved here. As the trial judge puts the issue, it is whether the Congress may constitutionally

---

[2] The President in his message to the Congress explaining his veto of the Internal Security Act of 1950 stated that he would "be glad to approve" § 23, the forerunner of the section here involved, "although the language of [§ 23] is in some respects weaker than is desirable." H. R. Doc. No. 708, 81st Cong., 2d Sess. 3.

[3] S. 4130, 81st Cong., 2d Sess. This substitute was proposed by Senators Benton, Douglas, Graham, Humphrey, Kefauver, Lehman, and the Chairman of the Senate Judiciary Committee, Senator Kilgore. For a discussion of the effect of the bill on the problem here presented see the remarks of Senator Humphrey at 96 Cong. Rec. 14486.

give the Attorney General "the unlimited right to subject a man to criminal penalties for failure to answer absolutely any question . . . ." 140 F. Supp., at 821. There is nothing in the record to indicate that the Attorney General attempted further to "inhibit" the appellee "from renewing activities that subjected [him] to deportation." It may be that the Attorney General would have tried further to "inhibit" appellee if the answers put to him had indicated any necessity therefor in the interest of national security. But that stage was never reached. All the Attorney General undertook was to question appellee. He got no answers. And the Court, in affirming, prevents the Attorney General from obtaining any answers to the questions. It is for this reason that we dissent. The scope of the Attorney General's right to inquiry is the sole issue here. The Congress beyond any question gave the Attorney General the authority he exercised. Whether it placed further authority in his hands to "inhibit" the alien's activities is not involved. We, therefore, see no necessity of invoking the rule of avoidance of constitutional questions. There are none to avoid for the Attorney General clearly has the right to question as to activities indicated by past conduct. It will be soon enough to pass on other supervisory powers when they are here.

However, since the majority has enlarged the issue to include the power to restrict the alien's activities we feel it necessary to comment thereon. We believe that the purpose of the Act was to prevent a deportable alien from using the period of his further residence for the continuation of subversive, criminal, immoral, or other undesirable activities which formed the basis of his ordered deportation. This is a part of the "congressional plan" with reference to control of subversive activities within the United States. *Pennsylvania* v. *Nelson,* 350 U. S. 497, 503–504 (1956). Several thousand alien Communists who have

been finally ordered deported will from now on, due to the Court's decision today, be under virtually no statutory supervision. Still they will, in all probability, remain among us for neither they nor the countries of which they are nationals wish them to leave. To their countries they are potential agents. The House Committee on the Judiciary recognized this danger in its report on facilitating the deportation of aliens. H. R. Rep. No. 1192, 81st Cong., 1st Sess. 8–13. Case histories set out in this report indicate that aliens ordered deported were refused visas by their native countries so that they might remain in the United States and carry on the very activities for which they were ordered deported. See also Hearings before the Senate Subcommittee on Immigration and Naturalization of the Committee on the Judiciary on S. 1832, 81st Cong., 1st Sess. 323. Were the deportee to cease the activity, no doubt his native land would issue the requisite visa and deal with him when he was returned.

In our view the power of the Congress with respect to aliens is exceedingly broad. Nothing points this out more forcibly than our own cases. Congress may expel any noncitizen it may determine is undesirable. The power given here is merely supplemental to that of expulsion and is a necessary concomitant thereof under the circumstances here presented. It gives to the Attorney General supervision of alien deportees whose past record discloses activities dangerous to our people. The appellee does not contest the charge as to his past activities. As we see it, the Congress has merely provided *limited* supervision which might prevent the alien from resuming the activity which brought on his ordered deportation. It may turn out that further limited supervisory precautions need not be exercised over appellee. However, we are in no position to know. The Attorney General himself does not know because he was prevented

from requiring the alien to give him the information. It is vital to effective supervision by the Attorney General for him to have the information he sought here. We believe that the counterbalancing necessity of preventing further detrimental conduct, or at least providing the authorities charged with the internal security of our country with some warning signal of it, substantially outweighs "issues touching liberties" which might be raised by the interrogation. Like "the police establishment of fire lines during a fire . . . the validity of the restraints . . . depends on all the conditions which obtain at the time . . . ." *Hirabayashi* v. *United States*, 320 U. S. 81, 99 (1943).

To us jailing alien deportees on the basis of our safety pending deportation proceedings as well as for six months thereafter, admittedly valid, is largely futile if the Attorney General cannot subsequently supervise them effectively. Certainly the Congress intended no such stultification.

We regret that the Court has used the rule of avoidance of constitutional issues to strip the Attorney General of this important power so necessary in the performance of his duty to protect our internal security.