118 F.3d 641
 97 Cal. Daily Op. Serv. 4844, 97 Daily Journal
D.A.R. 7939
Alla Konstantinova PITCHERSKAIA, Petitioner,
The International Human Rights Law Group, Intervenor,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 95-70887.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 11, 1996.
Decided June 24, 1997.
 
 Ignatius Bau, San Francisco, CA, and Suzanne Goldberg, Lambda Legal Defense and Education Fund, New York City, for Petitioner.
 Stephen W. Funk, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for Respondent.
 Petition for Review of an Order of the Board of Immigration Appeals. INS No. Ami-mdu-zpp.
 Before: FLETCHER, WIGGINS, and T.G. NELSON, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Alla K. Pitcherskaia petitions for review of the Board of Immigration Appeals' decision denying her application for asylum and withholding of deportation. We must decide whether Section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A), requires an alien to prove that her persecutor harbored a subjective intent to harm or punish. We conclude that it does not. We have jurisdiction over this timely petition, 8 U.S.C. § 1105a(a), and we grant the petition and remand to the board.
 
 I.
 
 2
 Alla Pitcherskaia is a 35 year old native and citizen of Russia. She entered the United States as a visitor for pleasure on March 22, 1992, with authorization to remain for six months. On June 2, 1992, she applied for asylum on the basis that she feared persecution on account of her own and her father's anti-Communist political opinions. After a complete interview, the Immigration and Naturalization Service Asylum Office found that she was credible and that she had suffered past persecution. However, it found that she failed to establish a well-founded fear of future persecution and denied her application. She was placed in deportation proceedings for overstaying her visa.
 
 
 3
 Pitcherskaia renewed her request for asylum and withholding of deportation, under sections 208(a) and 243(h) of the Immigration and Nationality Act ("INA" or "Act"), 8 U.S.C. §§ 1158(a) and 1243(h). In this application, she claimed an additional basis for granting her petition-that she was persecuted and feared future persecution on account of her political opinions in support of lesbian and gay civil rights in Russia, and on account of her membership in a particular social group: Russian lesbians.[1] She also requested voluntary departure.
 
 
 4
 The Immigration Judge ("IJ") conducted a full hearing at which Pitcherskaia and one other witness testified. The following is a summary of the relevant testimony presented at that hearing.
 
 
 5
 Pitcherskaia's father was an artist and political dissident. As a result of his antigovernment activities, he was arrested and imprisoned numerous times during Pitcherskaia's childhood until 1972 when he died in prison. Pitcherskaia testified that, because of her father's anticommunist activities, she has been under the control and surveillance of the police for her entire life.
 
 
 6
 Pitcherskaia was first arrested by the militia in 1980, when she was eighteen years old. She was charged with the crime of "hooliganism"[2] and detained for fifteen days because she protested her former school director's beating of a gay friend. At the time of this arrest, the director was unaware Pitcherskaia was herself a lesbian.
 
 
 7
 In 1981, Pitcherskaia was arrested again, imprisoned for fifteen days, and beaten for participating in an illegal demonstration demanding the release of the leader of a lesbian youth organization which she belonged to.[3] Pitcherskaia claims that, at the time of this arrest, the Russian militia warned her not to continue to associate with other women in the organization and threatened her with involuntary psychiatric confinement if she continued "to see women."[4]
 
 
 8
 Over the next two years Pitcherskaia claims that she was detained by the militia for short periods, interrogated, and on occasion beaten. On several occasions she was pressed to identify gay and lesbian friends. In May 1983, she was again arrested, charged with "hooliganism," and detained for ten days. Pitcherskaia maintains that the sole reason for her arrest was the arresting officer's knowledge of her sexual identity and political opinions.
 
 
 9
 In 1985 or 1986, Pitcherskaia's ex-girlfriend was forcibly sent to a psychiatric institution for over four months, during which time she was subjected to electric shock treatment and other so-called "therapies" in an effort to change her sexual orientation. Pitcherskaia testified that while she was visiting this woman at the psychiatric institution, she was grabbed by the militia, forcibly taken to a doctor's office and questioned about her sexual orientation. She was permitted to leave only after she provided a false address outside the jurisdiction of the clinic. Although she denied being a lesbian, the clinic registered her as a "suspected lesbian" and told her she must undergo treatment at her local clinic every six months. When she failed to show up for these outpatient sessions, she received a "Demand for Appearance." She testified that if she failed to comply, the militia would threaten her with forced institutionalization and forcibly take her from her home to the sessions.
 
 
 10
 Pitcherskaia testified that she attended eight of these "therapy" sessions. During these sessions, Pitcherskaia continued to deny that she was a lesbian. However, she was officially diagnosed with "slow-going schizophrenia," a catchall phrase often used in Russia to "diagnose" homosexuals. The psychiatrist prescribed sedative drugs, which Pitcherskaia never took. On one occasion, the psychiatrist tried to hypnotize her.
 
 
 11
 On two separate occasions, in 1990 and 1991, Pitcherskaia was arrested while in the homes of gay friends and taken to prison overnight. She received several "Demands for Appearance" when the militia sought to interrogate her about her sexual orientation and political activities. In 1991, she was interrogated about her activities with a gay and lesbian political organization-the "Union of Coming Out"-that had been denied legal recognition by the government.
 
 
 12
 Since her arrival in the United States, Pitcherskaia has received two more "Demands for Appearance" from the militia that were delivered at her mother's residence. Since she did not respond to the two recent Demands, Pitcherskaia fears that the militia will carry out their previous threats and forcibly institutionalize her if she returns to Russia.
 
 
 13
 After hearing testimony and reviewing an advisory opinion from the State Department, the IJ denied Pitcherskaia's applications for asylum and withholding of deportation and granted 30-days voluntary departure. The IJ did not render a specific finding with respect to Pitcherskaia's credibility, but simply proceeded as if her testimony was essentially credible. The IJ found that, "based upon the entire record including the Court's observation of the demeanor of the respondent as well as her witness while testifying and after consideration of the arguments of counsel," Pitcherskaia had not established that she was eligible for asylum pursuant to Section 208(a), nor that she was eligible for withholding of deportation pursuant to Section 243(h) of the Act.
 
 
 14
 Pitcherskaia appealed to the Board of Immigration Appeals ("BIA" or "Board"). In a divided opinion, the Board denied her appeal. The BIA majority voted to deny her petitions for asylum and withholding of deportation and to reinstate voluntary departure. The BIA majority did not make a finding as to Pitcherskaia's credibility because it found that, "even if her testimony is essentially credible," she had failed to meet her burden in establishing eligibility for relief under either Section 208(a) or 243(h) of the Act. The BIA majority concluded that Pitcherskaia had not been persecuted because, although she had been subjected to involuntary psychiatric treatments, the militia and psychiatric institutions intended to "cure" her, not to punish her, and thus their actions did not constitute "persecution" within the meaning of the Act. The BIA majority also concluded that recent political and social changes in the former Soviet Union make it unlikely that she would be "subject to psychiatric treatment with persecutory intent upon [her] return to the present-day Russia." The BIA majority denied withholding of deportation and granted voluntary departure under section 244(e) of the Act. 8 U.S.C. § 1254(e).
 
 
 15
 In dissent, Chairman Schmidt concluded that Pitcherskaia had established a well-founded fear of persecution on account of her membership in a particular social group. He rejected both the BIA majority's legal holding that an alien must prove that her persecutor had an "intent to punish" as well as its factual finding that the situation had improved markedly for gays and lesbians in Russia. Thus, he would have granted the petition for asylum. He concurred, however, in the BIA majority's decisions to deny withholding of deportation and to grant voluntary departure.
 
 
 16
 Because both the IJ and the BIA assumed, for purposes of their decisions, that Pitcherskaia's testimony was credible, we will also, for purposes of this appeal, assume that the testimony was credible.
 
 II.
 A. Statutory Scheme
 
 17
 The Attorney General may grant asylum to an alien present in the United States who is a "refugee." 8 U.S.C. § 1158(a). A "refugee" is an alien who is unable or unwilling to return to her or his country of origin "because of persecution or well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).[5] Either past persecution or a well-founded fear of future persecution provide eligibility for a discretionary grant of asylum. Lopez-Galarza v. INS, 99 F.3d 954, 958 (9th Cir.1996).
 
 
 18
 To establish a well-founded fear of persecution requires "subjectively genuine" and "objectively reasonable" fear of persecution "on account of" political opinion or membership in a particular social group. "The subjective component requires that the applicant have a genuine concern that he will be persecuted," Aguilera-Cota v. INS, 914 F.2d 1375, 1378 (9th Cir.1990), and may be satisfied by the applicant's testimony that she genuinely fears persecution. Acewicz v. INS, 984 F.2d 1056, 1061 (9th Cir.1993). The objective component requires that the alien establish a reasonable fear of persecution by credible, direct, and specific evidence. Lopez-Galarza, 99 F.3d at 958-59. An alien is not, however, required to present proof that persecution is more likely than not. INS v. Cardoza-Fonseca, 480 U.S. 421, 431, 107 S.Ct. 1207, 1212-13, 94 L.Ed.2d 434 (1987). "One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." Id.
 
 
 19
 An alien who establishes past persecution is presumed to have a well-founded fear of persecution. 8 C.F.R. § 208.13(b)(1)(i). However, this presumption may be rebutted where the conditions in the country have significantly changed. Id.; Prasad v. INS, 101 F.3d 614, 617 (9th Cir.1996). The INS bears the burden to rebut this presumption by a preponderance of the evidence. Singh v. INS, 94 F.3d 1353, 1361 (9th Cir.1996). Eligibility for asylum also may be established on the basis of past persecution alone. Lopez-Galarza, 99 F.3d at 959.
 
 
 20
 Pitcherskaia claims, inter alia, that the BIA applied an erroneous legal standard by insisting that intent to punish is a necessary element of "persecution." The meaning of "persecution" under section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A), is a legal question reviewed de novo. See Fisher v. INS, 79 F.3d 955, 961 (9th Cir.1996) (en banc) (reviewing de novo the Board's legal interpretations of the Immigration and Nationality Act). However, the BIA's interpretations are generally entitled to deference. Id. (citing Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Because the Act does not define "persecution," we defer to the Board's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." Id. (quoting Romero v. INS, 39 F.3d 977, 980 (9th Cir.1994)). The Board is also bound by our prior decisions interpreting the Act. Id.
 
 
 21
 B. The Definition of Persecution is Objective
 
 
 22
 The majority of the Board required that Pitcherskaia prove that the Russian authorities intended to harm or punish her. While acknowledging that forced institutionalization, electroshock treatments, and drug injections could constitute persecution, see e.g., Sagermark v. INS, 767 F.2d 645, 650 (9th Cir.1985) (suggesting that involuntary and unjust confinement to a mental institution may constitute persecution), the BIA majority concluded that because here the "[i]nvoluntary treatment and confinement [were] intended to treat or cure the supposed illness, not to punish," Pitcherskaia had not been persecuted nor did she have a well-founded fear of persecution. For the following reasons we conclude that in requiring Pitcherskaia to prove intent to harm or punish as an element of persecution, the BIA majority erred.[6]
 
 
 23
 Although many asylum cases "involve[ ] actors who had a subjective intent to punish their victims ... this subjective 'punitive' or 'malignant' intent is not required for harm to constitute persecution." In re Fauziya Kasinga, Int. Dec. 3278 at 12 (BIA June 13, 1996) (en banc) (designated as precedent by the BIA).[7] Neither the Supreme Court nor this court has construed the Act as imposing a requirement that the alien prove that her persecutor was motivated by a desire to punish or inflict harm.
 
 
 24
 We have defined "persecution" as "the infliction of suffering or harm upon those who differ ... in a way regarded as offensive." Sangha v. INS, 103 F.3d 1482, 1487 (9th Cir.1997) (citing Sagermark, 767 F.2d at 649). This definition of persecution is objective, in that it turns not on the subjective intent of the persecutor but rather on what a reasonable person would deem "offensive." That the persecutor inflicts the suffering or harm in an attempt to elicit information, as in Nasseri v. Moschorak, 34 F.3d 723, 724-25 (9th Cir.1994), for his own sadistic pleasure, as in Lopez-Galarza, supra, to "cure" his victim, or to "save his soul"[8] is irrelevant. Persecution by any other name remains persecution.
 
 
 25
 Motive of the alleged persecutor is a relevant and proper consideration only insofar as the alien must establish that the persecution is inflicted on him or her "on account of" a characteristic or perceived characteristic of the alien. See Elias-Zacarias, 502 U.S. at 481, 112 S.Ct. at 815. The BIA majority misconstrues this motive requirement. Elias-Zacarias does not require an alien to provide evidence that his persecutor's motive was to inflict harm and suffering in an effort to punish. It is the characteristic of the victim (membership in a group, religious or political belief, racial characteristic, etc.), not that of the persecutor, which is the relevant factor. Id. at 482, 112 S.Ct. at 815 (the ordinary meaning of persecution on account of political opinion "is persecution on account of the victim's political opinion, not the persecutor's").
 
 
 26
 The BIA majority erroneously relies on Canas-Segovia v. INS, 970 F.2d 599 (9th Cir.1992), as requiring an intent to punish. That case involved an alien who claimed that his religion prohibited military service and that he was persecuted because he refused military service. We held that in order to establish eligibility for asylum, the alien must show that he was persecuted on account of his religion, not simply because he refused to serve in the military. Canas-Segovia, 970 F.2d at 601 (applying the Elias-Zacarias motive requirement).
 
 
 27
 The Board has defined "persecution" as "the infliction of harm or suffering by a government, or persons a government is unwilling or unable to control, to overcome a characteristic of the victim." Kasinga, at 12. This " 'seeking to overcome' formulation has its antecedents in concepts of persecution that predate the Refugee Act of 1980." Id. The BIA majority, however invokes two prior BIA rulings, Matter of Mogharrabi, 19 I & N Dec. 439, 446 (BIA 1987) and Matter of Acosta, 19 I & N Dec. 211, 226 (BIA 1985), both of which speak in terms of an "intent to punish." To establish a well-founded fear of persecution, these cases require that an applicant for asylum establish that: "(1) the alien possesses a belief or characteristic a persecutor seeks to overcome in others by means of punishment of some sort; (2) the persecutor is already aware, or could ... become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and (4) the persecutor has the inclination to punish the alien." Mogharrabi, 19 I & N Dec. at 446 (quoting Acosta, 19 I & N Dec. at 226) (emphasis added). This test confuses punishment and persecution. The two concepts are not coterminous.
 
 
 28
 Although we have held that unreasonably severe punishment can constitute "persecution," see Rodriguez-Roman v. INS, 98 F.3d 416, 430 (9th Cir.1996), "punishment" is neither a mandatory nor a sufficient aspect of persecution. See e.g., Fisher, 79 F.3d at 963 (punishment for violation of enforcement of offensive regulations does not constitute persecution within the meaning of the INA). Webster defines to punish as "(1) To afflict with pain, loss, or suffering for a crime or fault; to chasten. (2) To inflict a penalty for (an offense) upon the offender." Webster's New Collegiate Dictionary 685 (Second Edition 1956). To persecute, in contrast, is defined as "(1) To pursue in a manner to injure; ... to cause to suffer because of belief, esp. religious belief. (2) To afflict, harass, or annoy...." Id. at 628. Hence, punishment implies that the perpetrator believes the victim has committed a crime or some wrong; whereas persecution simply requires that the perpetrator cause the victim suffering or harm. To the extent that Acosta and Mogharrabi require an alien to prove the persecutor harbored a subjective intent to punish, we reject their holdings.[9]
 
 
 29
 The current requirement that an alien have been persecuted or have a well-founded fear of persecution was part of the Refugee Act of 1980, Pub.L. No. 96-212, 94 Stat. 197, amending the INA. Congress passed the Refugee Act to conform the INA to the 1967 Protocol Relating to the Status of Refugees ("Protocol"). 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 (Jan. 31, 1967).[10] Because Congress intended the definition of "refugee" to conform to the Protocol, we often refer to the Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees ("Handbook") (interpreting the Protocol) when construing the Act. See e.g., Rodriguez-Roman, 98 F.3d at 425 ("Both the Supreme Court and this court have looked to the Handbook in determining refugee status, and consider it to be authoritative on the subject.") The definition of "persecution" in the Handbook does not include a subjective intent to punish or harm. Indeed, it acknowledges that "[o]ften the applicant himself may not be aware of the reasons for the persecution feared." Handbook, p. 17, p 66.
 
 
 30
 The fact that a persecutor believes the harm he is inflicting is "good for" his victim does not make it any less painful to the victim, or, indeed, remove the conduct from the statutory definition of persecution. The BIA majority's requirement that an alien prove that her persecutor's subjective intent was punitive is unwarranted. Human rights laws cannot be sidestepped by simply couching actions that torture mentally or physically in benevolent terms such as "curing" or "treating" the victims.
 
 CONCLUSION
 
 31
 In light of our holding that the definition of persecution applied by the BIA majority is erroneous, we do not reach Pitcherskaia's other claims; whether she established the requisite subjective and objective components for her asylum claim should be determined on remand. We express no view on whether the evidence established a valid claim of asylum when the appropriate definition of persecution is applied. We grant the petition for review and reverse the BIA's order denying asylum and withholding of deportation. We remand to the BIA for reconsideration consistent with this opinion.
 
 
 32
 PETITION FOR REVIEW GRANTED. REVERSED and REMANDED.
 
 
 
 [1]
 Pitcherskaia alleges that she did not include a claim for persecution on account of her lesbianism and her political activism for lesbian and gay rights in her original application because she did not know that it was a possible ground for an asylum claim
 
 
 [2]
 "Hooliganism" is a criminal charge used in Russia to arrest and detain persons for a variety of reasons, particularly political reasons. Persons arrested on this charge can be detained without trial for 10-15 days
 
 
 [3]
 Pitcherskaia admitted that, at the time, it was illegal for any organization or group of more than three individuals to demonstrate or assemble without permission from the government. Pitcherskaia also admitted that there was nothing political about this organization
 
 
 [4]
 Pitcherskaia provided evidence that many lesbians in Russia were, and continue to be, involuntarily "treated" and involuntarily confined in psychiatric institutions solely because they are lesbians. This "treatment" can include electroshock treatment and sedative drugs
 
 
 [5]
 In order for Pitcherskaia to qualify for asylum based on persecution or fear of persecution on account of her membership in a "particular social group," Russian lesbians must constitute a "particular social group" within the meaning of the INA. In its opinion, the IJ assumed lesbians constitute a "particular social group." Before the BIA, the majority specifically declined to reach the issue because it concluded that Pitcherskaia had not established that she had been persecuted or had a well-founded fear of persecution. We also do not reach the issue
 
 
 [6]
 This erroneous definition of persecution infected much of the Board's analysis
 
 
 [7]
 The BIA has authority to designate noteworthy decisions for publication and treatment as precedent. 8 C.F.R. § 3.1(g). Kasinga involved a Togolese woman who fled her home country after she was threatened with forced genital mutilation. The BIA concluded that, despite her persecutor's benevolent intent, Kasinga was a "refugee" because female genital mutilation can constitute "persecution" within the meaning of the Act. Kasinga, Int. Dec. 3278 at 12
 
 
 [8]
 "Among the original aims of the [Spanish] inquisition ... was the intention to save misguided believers from the agony of hellfire, the pain inflicted by the inquisitors a pale imitation of the eternal punishment awaiting those who did not repent." Larousse Dictionary of Beliefs & Religions 243 (1994) (Inquisition)
 
 
 [9]
 We similarly reject the definition of "persecution" adopted by the Fifth Circuit which requires "a showing by the alien that harm or suffering will be inflicted upon her in order to punish her for possessing a belief or characteristic a persecutor sought to overcome." Faddoul v. INS, 37 F.3d 185, 188 (5th Cir.1994) (internal quotations omitted) (emphasis added)
 
 
 [10]
 The United States acceded to the Protocol in 1968