Arie SHAAR; Helina Shaar; Shay Moshe Shaar, Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 96–70619.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1997.

Decided April 15, 1998.

Russell L. Marshak, Popkin, Shamir & Golan, Los Angeles, California, for petitioners/appellants.

Bridgid E. Dowdal and Hugh G. Mullane, United States Department of Justice, Civil Division, Washington, DC, for respondent.

Before: BROWNING, BRUNETTI and FERNANDEZ, Circuit Judges.

Opinion by Judge Fernandez; Dissent by Judge Browning.

FERNANDEZ, Circuit Judge:

After deportation proceedings against them had become final and they had been given the privilege of voluntary departure, Arie Shaar, his wife Helina Shaar, and their adult son Shay Shaar petitioned for reopen-

ing of their case so that they could apply for suspension of deportation pursuant to 8 U.S.C. § 1254(a)(1). The Immigration Judge denied reopening because the Shaars had not departed during the allotted voluntary departure time, and the Board of Immigration Appeals upheld that decision, even though the Shaars had petitioned to reopen just before the time to voluntarily depart had expired. The Shaars have petitioned for review of that decision. We deny the petition.

## BACKGROUND

The Shaars were permitted to enter this country as nonimmigrant visitors for pleasure on July 17, 1987 and were to depart by January 16, 1988. As is too often the case, they simply did not leave when they were supposed to, and thus avoided all normal immigration channels and stole a march on those who chose to proceed in the orderly manner provided by law.

However, by March 12, 1993, the Immigration and Naturalization Service had caught up with the Shaars and charged that they were deportable as overstays. *See* 8 U.S.C. § 1251(a)(1)(B). At a deportation hearing on August 19, 1993, they were found to be deportable, but the IJ exercised his discretion to permit them to voluntarily depart on or before April 18, 1994, and directed that they would be deported, if they did not depart by the agreed-upon date. *See* 8 U.S.C. § 1254(e). At that point, they were given oral and written warnings that they would not be eligible for certain forms of relief, including suspension of deportation, if they did not leave by the specified date. *See* 8 U.S.C. § 1252b(e)(2)(B). At a later time, the District Director of the INS extended the voluntary departure date to October 21, 1994.

By July 17, 1994, the Shaars had managed to remain here for seven years, and that raised the possibility that they could obtain suspension of deportation. *See* 8 U.S.C. § 1254(a)(1). They did not immediately apply for that relief. Instead, they waited until October 19, 1994—just two or three days before their scheduled departure date—to ask for it. They made no effort to seek an extension of the departure date, and by December 2, 1994, when their request to reopen

was heard, the departure date had come and gone, but they were still here. Thus, their request to reopen was denied pursuant to 8 U.S.C. § 1252b(e)(2). The BIA dismissed their appeal, and this petition followed.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction pursuant to 8 U.S.C. § 1105a(a). The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. 104–208, 110 Stat. 3009 has repealed 8 U.S.C. § 1105a, but that removal of jurisdiction does not apply to this petition. *See* IIRIRA §§ 306(c), 309(a) and (c)(1).

■ We review denials of motions to reopen for abuse of discretion. *See INS v. Doherty,* 502 U.S. 314, 322, 112 S.Ct. 719, 724, 116 L.Ed.2d 823 (1992). However, more than that is involved here because we are asked to construe provisions of the Immigration and Nationality Act. That raises issues of law, which we review de novo. *See Pitcherskaia v. INS,* 118 F.3d 641, 646 (9th Cir. 1997).

■ Having said that, however, we have not said quite enough because there can be no doubt that "Congress has entrusted the BIA with the administration of the [INA]." *Mendoza v. INS,* 16 F.3d 335, 337 (9th Cir. 1994). Of course, if "Congress has directly spoken to the precise question at issue" there is little left to do. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). In *Chevron,* the Supreme Court went on to say:

If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether

the agency's answer is based on a permissible construction of the statute. *Id.* at 842–43, 104 S.Ct. at 2781–82. In other words, we must not substitute our interpretation for a "reasonable interpretation" made by the agency and must accept that interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782.

These principles apply to our review of the BIA's construction of the INA. As we have said, "[w]e show considerable deference . . . to the BIA's interpretation" of the INA, *Mendoza* 16 F.3d at 337, and "we defer to the [BIA's] interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute,'" *Pitcherskaia*, 118 F.3d at 646 (citations omitted). With these glasses to peer through, we turn to look at and analyze the statute at hand.

### DISCUSSION

■ A. *The Statute.* When the Shaars sought to reopen, they were faced with the provisions of 8 U.S.C. § 1252b(e)(2)(A), which reads:

> Subject to subparagraph (B), any alien allowed to depart voluntarily under section 1254(e)(1) of this title or who has agreed to depart voluntarily at his own expense under section 1252(b)(1) of this title who remains in the United States after the scheduled date of departure, other than because of exceptional circumstances, shall not be eligible for relief described in paragraph (5) for a period of 5 years after the scheduled date of departure or the date of unlawful reentry, respectively.

There is no question that the Shaars were given the notice required by § 1252b(e)(2)(B), so the "subject to" phrase, which opens the quoted section, need not be considered at this time. Moreover, there is no doubt that the suspension of deportation relief sought by the Shaars is one of the types of relief which is blocked by the section. *See* 8 U.S.C. § 1252b(e)(5).

The BIA ruled that § 1252b(e)(2)(A) precluded relief because by its plain words a person could not obtain that relief, if he had remained here "after the scheduled date of departure." We find no fault with that reading of the statute, for that is what the statute plainly says. In fact, the language could hardly be more clear. Only wrenching the words out of their normal channels could result in adding exceptions to them.

We must assume that Congress used the statutory words in the normal sense and with their ordinary meanings. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987). In so doing, Congress directly said that an alien simply cannot garner the sought after relief, if the alien remained after the scheduled departure date, unless, of course, there were truly exceptional circumstances. We will visit the exceptional circumstance issue later, but for now it is quite clear that the Shaars did not depart on the scheduled date, even though nothing stopped them from doing so.

We have started with the language of the statute itself, as we must. *See INS v. Phinpathya*, 464 U.S. 183, 189, 104 S.Ct. 584, 589, 78 L.Ed.2d 401 (1984). Having found that language clear and unambiguous, we need go no further and, the Shaars' arguments notwithstanding, we need not even consider the legislative history. *See Villegas–Valenzuela v. INS*, 103 F.3d 805, 810 (9th Cir.1996); *Tang v. Reno*, 77 F.3d 1194, 1196 (9th Cir. 1996); *Perroton v. Gray (In re Perroton)*, 958 F.2d 889, 893 (9th Cir.1992). Here we do not face "rare and exceptional circumstances," which would require us to go beyond the statute. *Perroton*, 958 F.2d at 893. That is, there is no reason to look beyond the statute in a case, like this one, where "the result is not absurd." *Tang*, 77 F.3d at 1197. We should not attempt to construct some purpose or congressional intent from other materials. But, even looking further, we find nothing in the contemporaneous legislative history which would induce us "to question the strong presumption that Congress expresses its intent through the plain language it chooses." *Cardoza–Fonseca*, 480 U.S. at 432 n. 12, 107 S.Ct. at 1213 n. 12.

Rather, it is clear that Congress desired to control the untoward delays which had developed in the immigration system, and to expedite proceedings to the extent reasonably possible. *See Stone v. INS*, 514 U.S. 386,

400, 115 S.Ct. 1537, 1546, 131 L.Ed.2d 465 (1995). Every delay inures to the benefit of the alien, who is here improperly and who understandably desires to stay. Nor are aliens beyond attempting to manipulate the system for the purpose of injecting as much delay as possible into proceedings. *See id.* Here, for example, the Shaars did not apply for suspension of deportation as soon as that was possible. They waited, instead, until just a couple of days before they were to depart. Moreover, they did not ask the District Director for another extension of their departure date. They, instead, avoided that orderly process and simply stayed on beyond the scheduled date, without a by-your-leave from the District Director or any other representative of the United States. We see no reason to treat the statute as a Delphiac pronouncement and ourselves as it's annointed hierophants. It is not, and we are not. Congress plainly expressed itself, and plainly provided a single escape from the strictures of the provision—exceptional circumstances. Were there any here? We think not.

■ Congress itself has narrowly defined what exceptional circumstances are, which underscores its serious concern about people who do not leave on the appointed date. It has provided that "[t]he term 'exceptional circumstances' refers to exceptional circumstances (such as serious illness of the alien or death of an immediate relative of the alien, but not including less compelling circumstances) beyond the control of the alien."[1] 8 U.S.C. § 1252b(f)(2). In no sense can the Shaars claim that the mere filing of a petition to reopen is as compelling as the circumstances confronting a person who is scheduled to leave but stays behind because he is seriously ill or because an immediate relative has just died. Nothing that dire kept the Shaars here. They had already found ways

to overstay their visas, and hoped that they could reopen their proceedings and stay longer still. Departing was not beyond their control. No doubt, it was an unpleasant prospect to them, but it surely was not "exceptional." Indeed, the circumstance here was rather common. It was a simple case of obtaining an extension of the departure date, and thereby opening up the possibility that suspension of deportation could also be obtained. Moreover, their failure to depart was not beyond their control. In fact, they did not even apply for an extension of time, an act that clearly was within their control.

■ Nor are we impressed with the Shaars' claim that the hearing date on their request to reopen was beyond their control and was, therefore, exceptional. It was actually neither. It was hardly exceptional that the IJ could not reach their petition to reopen within the two or three days between October 19 and October 21, 1994, which they saw fit to give him. In fact, interestingly enough, he did reach their case by December 2, 1994, less than two months after they filed. Had they filed when they first became eligible, July 17, 1994, perhaps their petition would have been reached before the period for departure ran out. Perhaps the Shaars did not want to take a chance that their petition would be denied and, as it is, they have now managed to remain here for three more years, while these proceedings go forward. In short, the departure situation was not beyond their control and, even if it were, it was not even remotely as compelling as a serious illness of the alien himself or the death of an immediate relative.[2]

Therefore, reading § 1252b(e)(2)(A) to preclude the construction given to it by the BIA would require us to perform an act of sorti-

---

1. Congress has not had second thoughts about narrow definitions of exceptional circumstances. In fact, in IIRIRA, it adopted a definition in another section which either explicitly narrowed the definition still further or made it clear that "immediate relative" is an extremely small subset of people—spouses, children and parents. *See* 8 U.S.C. § 1229a(e)(1).

2. To the extent that the Shaars argue that this is inconsistent with the purposes of the voluntary

departure scheme, we disagree. Voluntary departure is a matter of privilege, rather than of right. *See Villanueva–Franco v. INS,* 802 F.2d 327, 329 (9th Cir.1986). Its purpose is to allow an alien to leave without stigma or the adverse consequences of deportation. *See Contreras–Aragon v. INS,* 852 F.2d 1088, 1090 (9th Cir.1988) (en banc). It is not to allow the alien to accrue new rights to remain, even if that sometimes happens to be the result.

lege beyond our powers. The BIA did not err.

B. *The Shaars' other arguments.* The Shaars make other arguments in an effort to save their situation. None will serve the purpose.

■ The Shaars suggest that, as a matter of law, the statutory bar date was tolled when they filed their petition to reopen. But the authority they cite has nothing to do with petitions to reopen. It has to do with direct review. *See Matter of Chouliaris,* Interim Decision 2572, 16 I. & N. Dec. 168 (BIA 1977); *Matter of Villegas Aguirre,* Interim Decision 1940, 13 I. & N. Dec. 139 (BIA 1969). There is no similarity between the two.

Direct review has not been discouraged or disfavored, while reopening has been. *See Doherty,* 502 U.S. at 323, 112 S.Ct. at 724–25; *INS v. Abudu,* 485 U.S. 94, 107, 108 S.Ct. 904, 913, 99 L.Ed.2d 90 (1988). Moreover, the regulations do not provide for a stay or tolling upon the filing of a petition to reopen. *See Matter of Tuakoi,* Interim Decision 3004, 19 I. & N. Dec. 341, 349 (BIA 1985); 8 C.F.R. § 3.8(a) (1995) (the filing of a motion to reopen does not stay proceedings); *cf.* 8 C.F.R. § 3.6 (1995) (stay of an appeal is provided for, except from denial of a motion to reopen or reconsider). Beyond that, if an extension of the voluntary departure date is desired, the District Director has the authority to grant it. *See* 8 C.F.R. § 244.2 (1995); *see also Williams v. INS,* 795 F.2d 738, 744–45 (9th Cir.1986). Again, the Shaars chose not to utilize that route. There was no automatic tolling here.

The Shaars then suggest that their due process or equal protection rights have been violated. In so doing, they essentially argue that their fundamental right to remain in the United States has somehow been improperly, or at least unfairly, terminated. But their major and minor premises are all faulty.

■ First, the Shaars have no fundamental right to be in the United States. *See Harisiades v. Shaughnessy,* 342 U.S. 580, 586–87, 72 S.Ct. 512, 517, 96 L.Ed. 586 (1952). Moreover, Congress has exceedingly broad power over the admission and expul-

sion of aliens. *See Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977). In fact, " 'over no conceivable subject is the legislative power of Congress more complete than it is over' " the subject of the admission and expulsion of aliens. *Id.* at 792, 97 S.Ct. at 1478. Of course, the Shaars were only admitted for a temporary pleasure visit in the first place.

■ Second, the Shaars were not subjected to some improper, unreasonable, or irrational classification. *Cf. Perez–Oropeza v. INS,* 56 F.3d 43, 45 (9th Cir.1995). They were found to be here improperly and were given the privilege of departing within a particular period, rather than being seized and deported forthwith. The fact that they have not been able to take advantage of some additional benefit, because they did not leave on time or get that time extended, does not show any irrationality. Moreover, it can hardly be gainsaid that they were given all the process they were due before they were told to depart our shores. *See Sharma v. INS,* 89 F.3d 545, 548 (9th Cir.1996).

That some people under somewhat similar circumstances might manage to remain long enough to accrue some benefit or other does not show that the Shaars' constitutional rights have been violated. The most it shows is that at the fringes every statute can seem unfair because one person did or did not take just one little last step that brought himself within (or allowed him to avoid) the strictures of a statute. When we focus on marginal cases, a statute may often seem to be mischievous or otherwise objectionable. If so, the remedy for that inevitable possibility lies with the legislature rather than with the courts. *See Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 50–51, 75 L.Ed. 156 (1930); *United States v. Valencia–Andrade,* 72 F.3d 770, 774 (9th Cir.1995).

Perhaps, as the Shaars suggest, the INS and the BIA could manipulate the system so as to treat aliens unfairly for arbitrary or downright improper reasons. Perhaps those entities could do that by injecting unexpected delays into the setting of a hearing of a very timely petition to reopen, while denying extensions of time to depart. We, however,

have no reason to think that the agencies will do so, nor is there the slightest hint that they did so here. If anyone attempted to manipulate the system, it was the Shaars, who waited until the eve of their scheduled departure to ask for the relief they now seek. We can detect no violation of the Constitution.

## CONCLUSION

The Shaars were given the privilege of entering the United States for pleasure, and they were to leave by January 16, 1988. They did not leave. When finally discovered, they were given the further privilege of voluntarily departing by April 30, 1994, and that privilege was extended to October 21, 1994. Again, they did not leave. Instead, on October 19, 1994, they filed a motion to reopen to petition for suspension of deportation pursuant to 8 U.S.C. § 1254(a)(1). Not surprisingly, their motion was not acted upon before October 21, 1994. Because they did not leave on the "scheduled date of departure" and because no "exceptional circumstances" precluded their going, they are not entitled to suspension of deportation. *See* 8 U.S.C. §§ 1252b(e)(2)(A),(f)(2). Now, almost ten years after they were supposed to depart, they must leave, for even the most persistent peregrines must finally adhere to the immigration precepts of the land which they were privileged to visit.

Petition DENIED.

BROWNING, Circuit Judge, dissenting.

The facts are simple. The Shaars were granted voluntary departure. During their period for voluntary departure, they became eligible for suspension of deportation and filed motions to reopen requesting such relief.[1] The immigration judge had not decided the motions when the period for voluntary departure expired, and petitioners did not depart. When the motions were finally considered, they were denied on the ground that 8 U.S.C. § 1252b(e)(2)(A) bars relief to any alien who has overstayed his voluntary departure period.

## I.

This interpretation of Section 1252b(e)(2)(A), adopted by a bare majority of the Board of Immigration Appeals ("BIA") and affirmed by this panel, reads the statute to create an absolute bar to discretionary relief, lifted only if the alien can show "exceptional circumstances." It substitutes a lottery for predictable decision-making. Some applicants who file timely, meritorious motions will be heard; most will not—based solely on whether the particular administrative law judge to whom their motion is assigned happens to act within their discretionarily-defined voluntary departure period.[2] This interpretation ignores Congress' intent that aliens be permitted to file, and the Immigration and Naturalization Service ("INS") be required to hear, a single, timely-filed, meritorious motion to reopen; it treats similarly situated aliens in a disparate manner, and forces aliens to forgo congressionally-authorized relief or face a substantial penalty. It is both unreasonable and arbitrary.

It is unreasonable because it rests on the premise that Congress intended to allow aliens to file certain motions to reopen, but to preclude immigration judges from hearing them. Both by statute and regulation, aliens have been authorized to file motions to reopen. *See* 8 U.S.C. § 1229a(c)(6); 8 C.F.R. § 3.2. In fact, Congress first explicitly authorized motions to reopen in the same section of the Immigration Act of 1990 which adopted Section 1252b(e)(2)(A). *See* Pub.L. No. 101–649, 104 Stat. 4978, 5063–64, § 545(a) (1990) ("IMMACT 90"). Congress directed the Attorney General to establish limitations on the "period of time in which motions to reopen" may be filed and the "number of such motions that may be filed," *see id.* at 5066, § 545(d), but did not preclude motions to reopen filed after a grant of vol-

---

1. Petitioners had resided in the United States continuously for more than seven years and their moral character was not in question. *See* 8 U.S.C. § 1254(a).

2. Those few motions to reopen decided within the brief period commonly granted for voluntary departure, *see* 8 U.S.C. §§ 1229c(a)(2), 1229c(b)(2), will be functionally unappealable, since the BIA usually takes a year or more to decide appeals.

untary departure, or place any other restrictions on motions to reopen. Accordingly, the Shaars, who filed a single motion to reopen within 90 days of the final administrative decision—meeting the time and number requirements adopted by the Attorney General, *see* 8 C.F.R. § 3.23(b)(4)(i), and later by Congress, *see* 8 U.S.C. § 1229a(c)(6)—were authorized to file their motions to reopen. The majority's interpretation of Section 1252b(e)(2)(A), however, would preclude an immigration judge from hearing their motions. Congress, then, must have intended to allow motions to reopen to be filed but not heard. Because this conclusion is absurd, I dissent from the majority's interpretation of the statute.[3]

The majority's interpretation is arbitrary because it assumes Congress intended that an alien's opportunity to obtain relief depend not on the merits of the alien's application, but on whether a randomly assigned tribunal happens to act on the motion within the alien's period of voluntary departure. Aliens with equally meritorious claims will be given relief or deported based on nothing more than the backlog of the judges assigned to hear their cases.[4]

The proposed interpretation is arbitrary in another respect. In *Contreras–Aragon v. INS*, 852 F.2d 1088 (9th Cir.1988) (en banc), and *Matter of Chouliaris*, Interim Decision 2572, 16 I. & N. Dec. 168 (BIA 1977), this court and the BIA acted to preserve an alien's right to pursue a meritorious appeal without sacrificing the benefits of voluntary

departure.[5] Yet the majority presents aliens with an even starker dilemma: Leave at the end of the voluntary departure period and thereby forfeit the right to suspension of deportation granted by Congress, or remain, forgo a hearing on the merits, and be precluded from relief for five years.[6]

The only basis suggested by the majority for the disparate treatment of appeals and motions to reopen is that the latter are "disfavored." The majority finds authority for this proposition in *INS v. Doherty*, 502 U.S. 314, 323, 112 S.Ct. 719, 724–25, 116 L.Ed.2d 823 (1992). *Doherty* held only that the grant or denial of a motion to reopen is discretionary; it did not vest discretion in the INS to decide whether or not to entertain motions to reopen. Although the majority flatly asserts "[t]here is no similarity" between motions to reopen and direct review, Majority op. at 3427, they share a critical similarity—Congress has authorized both. In the face of explicit congressional authorization of motions to reopen, *see* 8 U.S.C. § 1229a(c)(6), the abstract "disfavor" in which such motions may be held cannot justify the majority's conclusion.

Nor does the Shaars' failure to apply for a further extension or to file their motion earlier justify the majority's decision. By relying on the supposed availability of extensions to preserve aliens' claims, the majority's interpretation takes the final decision on meritorious motions to reopen out of the hands of this court, the BIA, or even an immigration

---

3. *See In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978) (courts may go beyond literal meaning to avoid absurd result); *Tang v. Reno*, 77 F.3d 1194, 1196–97 (9th Cir.1996); *see, e.g., Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1301 (9th Cir.1997) (interpreting exemption of "films" and "television programs" to include videotapes, as result would otherwise be absurd).

The absurdity sanctioned by the majority's reading falls into the second category described in *Heppner v. Alyeska Pipeline Serv. Co.*, 665 F.2d 868, 872 (9th Cir.1981), which "a court may correct by interpretation." This "occurs ... when Congress uses more sweeping language than it would if it were attending carefully to fact situations, outside the scope of its purpose, to which the language might be erroneously understood to apply." *Id.*

4. *See Matter of Shaar*, Interim Decision 3290, 1996 WL 426889 (BIA 1996) (Guendelsberger, B.M., dissenting).

5. In *Contreras–Aragon*, 852 F.2d at 1094–95, this court held that the voluntary departure period of an alien who files a petition for review is continued through the period of the court's review. Similarly, the BIA has held that an appeal from an immigration judge's decision tolls the voluntary departure period. *See Matter of Chouliaris*, 16 I. & N. Dec. 168; *Matter of Villegas Aguirre*, Interim Decision 1940, 13 I. & N. Dec. 139 (BIA 1969).

6. Under *Matter of Barragan*, Interim Decision 2097, 13 I. & N. Dec. 759 (BIA 1971), an alien's departure breaks the continuity of physical presence for purposes of eligibility for suspension of deportation.

judge, and places it with the district director who initiated the proceedings to deport the alien in the first place. It is unfair and mischievous to premise a party's ability to pursue a meritorious claim on the consent of the opposing party, who may exercise this power arbitrarily to defeat the claim.[7] Moreover, the majority's interpretation will deny relief to *all* aliens whose voluntary departure period has expired, including those who, unlike the Shaars, file immediately and request, but are denied, an extension. It may be true that the Shaars could not reasonably expect their claims to be heard before the expiration of their time for voluntary departure, but even applicants who file motions to reopen promptly will have no guarantee of a hearing and, as one BIA member suggested, no great likelihood of one.

The eligibility of such applicants for relief will not turn on their own actions or the merits of their claims, but on factors entirely beyond their control. The fact that Congress has authorized suspension of deportation for these applicants, and authorized them to file a motion to reopen for this purpose, is rendered irrelevant, not because Congress said so, or because the authorized agency found them unworthy of relief, but simply because an immigration judge was busy with another matter, or perhaps out of town, and did not get around to their motion.

## II.

The irrationality of allowing motions to reopen to be filed but not heard, and of conditioning the grant or denial of relief on reasons unrelated to the merits also raises serious questions of due process and the equal protection of the laws.

## A.

"Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982). The majority focuses on the process the Shaars received prior to the grant of voluntary departure, declaring "it can hardly be gainsaid that they were given all the process they were due before they were told to depart our shores." Majority op. at 958. The relevant question, however, is whether the Shaars were denied the process Congress established for the consideration of motions to reopen.[8] Whether or not a motion to reopen is *required* for due process in deportation proceedings, "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts v. Lucey,* 469 U.S. 387, 401, 105 S.Ct. 830, 838–39, 83 L.Ed.2d 821 (1985). The majority avoids the critical issue by characterizing a motion to reopen to apply for discretionary relief from deportation as "some additional benefit," Majority op. at 958, rather than as the process Congress established to allow meritorious claims for relief to be brought to light.[9]

## B.

The disparate treatment of similarly situated aliens implicates the guarantee of equal

---

7. According to petitioners, at least one INS district office has instituted a blanket policy of denying all voluntary departure extension requests based on the fact that a motion to reopen has been filed but has not yet been acted on by an immigration judge.

8. "Due process, in deportation proceedings, includes the right to a full and fair hearing," *see Sharma v. INS,* 89 F.3d 545, 548 (9th Cir.1996) (internal quotation marks omitted), and the "opportunity to be heard at a meaningful time and in a meaningful manner," *see Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (internal quotation marks omitted); *see also de la Llana–Castellon v. INS,*

16 F.3d 1093, 1096 (10th Cir.1994) ("[due process] requires that the decisionmaker actually consider the evidence and argument that a party presents").

9. *See Rhoa–Zamora v. INS,* 971 F.2d 26, 34 n. 8 (7th Cir.1992) ("We do note that in order for the motion to reopen procedure to satisfy the requirements of due process it must provide a 'a meaningful opportunity to be heard.' Thus, as the D.C. Circuit recently recognized, it would raise a serious due process problem if the Board did not actually consider these motions but simply filed them away in some obscure nook or cranny until the petitioner in question could be deported.") (internal citations omitted).

protection. Even in the absence of a fundamental right, the government must still demonstrate a rational basis for such treatment. *See Reno v. Flores*, 507 U.S. 292, 306, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993) ("Of course, the INS regulation must still meet the (unexacting) standard of rationally advancing some legitimate governmental purpose ...").[10] Under the majority's interpretation, two aliens with identical suspension of deportation claims, who are due to voluntarily depart on the same date, who file motions to reopen on the same date, may face drastically different fates. If this result sprang from a discretionary determination that one alien was unworthy of relief, or did not timely file an appropriate motion, it would be acceptable. But the disparate treatment permitted by the majority's interpretation does not arise from any substantive or procedural difference between applicants; it arises from the arbitrary assignment of one applicant's motion to a judge who could and did act upon it promptly, and the other to one who could not or did not. Such arbitrary distinctions violate equal protection. "[I]ndividuals within a particular group may not be subjected to disparate treatment on criteria wholly unrelated to any legitimate governmental interest." *Francis v. INS*, 532 F.2d 268, 273 (2d Cir.1976).

The majority simply asserts, as I have noted, that the Shaars' inability "to take advantage of some additional benefit does not show any irrationality." Majority op. at 958. But again, this is not the relevant question; rather, we must determine whether any rational basis exists for distinguishing between aliens who timely file meritorious claims. The majority provides none. Instead, it suggests this equal protection analysis mistakenly "focus[es] on marginal cases." Majority op. at 958. But the equal protection clause does not cease to operate at the margins.

The majority believes the Shaars' delay in filing and failure to request a further extension negates these constitutional concerns. But the absolute bar created by the majority's interpretation of Section 1252b(e)(2)(A) applies with equal force to aliens who have taken every step the majority asks of them. It applies to all cases, not to the Shaars alone.

## III.

### A.

Contrary to the majority's conclusion, the language of Section 1252b(e)(2)(A) does not compel this "absurd, and perhaps unconstitutional, result."[11] We are required to give effect to the plain meaning of statutory provisions, *see INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 1212–13, 94 L.Ed.2d 434 (1987), but the plain meaning of a statute is not determined by its language alone; statutory context and congressional policy are also relevant.[12] The majority's interpretation instead relies on an "uncritical literalism" the Supreme Court has recently admonished us to avoid. *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, ——, 117 S.Ct. 832, 838, 136 L.Ed.2d 791 (1997).[13]

---

**10.** *See Paointhara v. INS*, 708 F.2d 472, 473 (9th Cir.1983) ("Classifications among aliens satisfy equal protection if supported by a rational basis."); *see also Raya–Ledesma v. INS*, 55 F.3d 418, 419 (9th Cir.1995).

**11.** *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring) ("We are confronted here with a statute which, if interpreted literally, produces an absurd, and perhaps unconstitutional, result.").

**12.** *See Almero v. INS*, 18 F.3d 757, 760 (9th Cir.1994) ("To determine the plain meaning and purpose of a portion of a statute, we must examine not only the specific provisions at issue, but also the structure of the law as a whole including its object and policy.").

**13.** *See United States v. Witkovich*, 353 U.S. 194, 199, 77 S.Ct. 779, 782, 1 L.Ed.2d 765 (1957); *Heppner v. Alyeska Pipeline Service Co.*, 665 F.2d 868, 872 (9th Cir.1981) ("Although the language of section 1653 is facially clear and unambiguous, the plain meaning rule, as currently articulated by the Supreme Court, requires us to approach the statute, not with mechanical literalism, but with the purpose of implementing Congressional intent."); *see also United States v. Alvarez–Sanchez*, 975 F.2d 1396, 1400 (9th Cir.1992), *rev'd on other grounds*, 511 U.S. 350, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994) ("Courts must not make a fetish of construing statutes in a literal fashion. Our role is not that of a super-grammarian obsessed with the plain meaning of language but rather that of perceptive diviner of congres-

Though the literal language of Section 1252b(e)(2)(A) ("any alien allowed to depart voluntarily ... who remains in the United States after the scheduled date of departure ... shall not be eligible for relief") appears to preclude *any* grant of relief following expiration of an alien's voluntary departure period, such relief remains available in at least two situations not spelled out in the words of the statute: (1) when a petitioner's voluntary departure period is reinstated *after* the initial period has expired, restoring eligibility for relief notwithstanding the "absolute" bar, *see* 8 C.F.R. § 244.2; and (2) following an appeal to the BIA or court of appeals, *see Contreras–Aragon,* 852 F.2d at 1092–93; *Matter of Chouliaris,* 16 I. & N. Dec. 168.[14] In light of these implicit exceptions to its facially absolute preclusion of relief, Section 1252b(e)(2)(A) necessarily permits more than its bare language suggests.

Section 1252b(e)(2)(A) does not directly address petitioners' circumstance, neither avowing nor disavowing an intent to punish an alien who files a timely and meritorious motion to reopen which, through no fault of his own, is not heard before his date of voluntary departure. "[A] statute, although seemingly clear at first, often contains latent ambiguities, requiring recourse to other ex-

planatory sources." *United States v. Garner,* 767 F.2d 104, 110 (5th Cir.1985).[15] Section 1252b(e)(2)(A) is just such a statute, as made apparent by the BIA's fractured decision[16] and by the INS' failure to even propose the majority's reading of the statute to the immigration judge.[17]

## B.

Faced with this latent ambiguity, we must consider whether the legislative history of IMMACT 90 reveals Congress' intent. *See Oklahoma v. New Mexico,* 501 U.S. 221, 235 n. 5, 111 S.Ct. 2281, 2289–90 n. 5, 115 L.Ed.2d 207 (1991). That history does not support the majority's conclusion that IMMACT 90 was motivated by a single-minded determination to prevent any delay in the deportation process; nor does it compel the majority's interpretation of Section 1252b(e)(2)(A).

IMMACT 90 clearly reflects an intent to close loopholes and restrict immigrants' procedural options in various ways, but it does not demonstrate any firm conviction that aliens are abusing motions to reopen. To the contrary, Congress requested the Attorney General to make "recommendations for the prevention of such abuse, *if any exists,*"

---

sional intent.") (citing *United States v. Monia,* 317 U.S. 424, 431, 63 S.Ct. 409, 412–13, 87 L.Ed. 376 (1943) (Frankfurter, J., dissenting) ("The notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification."); *Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir.1944) (Hand, J., concurring) ("There is no surer way to misread any document than to read it literally ...")).

**14.** Congress took no steps to curtail these "exceptions," in IMMACT 90 or its three subsequent revisions of the INA. In light of the Ninth Circuit's *en banc* decision in *Contreras–Aragon,* decided shortly before Congress began hearings on IMMACT 90, Congress' silence is consistent with its acceptance of these exceptions to Section 1252b(e)(2)(A)'s bar.

Furthermore, neither the INS, BIA, nor this court have acted to conform their regulations and decisions to an absolute bar. In this regard, the Supreme Court has noted "that the weight of an administrative interpretation will depend, among other things, upon its consistency with earlier and later pronouncements of an agency." *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055,

1075, 39 L.Ed.2d 270 (1974) (internal quotation marks omitted).

**15.** *See Weissman v. Congregation Shaare Emeth,* 38 F.3d 1038, 1041 (8th Cir.1994) (holding Age Discrimination in Employment Act is "silent on the question" at hand, contrary to "a literal reading of the statut[e]"); *United States v. Blackston,* 940 F.2d 877, 883–84 (3d Cir.1991) (concluding "latent ambiguity" exists, notwithstanding "relatively straightforward language").

**16.** The vast majority of BIA decisions are unanimous; this one was sharply divided (7–5), with substantial dissent expressed in four separate opinions. A WESTLAW search of BIA decisions dating back to 1940 reveals the rarity of such division. Dissents are infrequent; in those *en banc* cases in which there is dissent, the vote is rarely close; publication of four, separate dissents is unprecedented.

**17.** In light of the ambiguity of Section 1252b(e)(2)(A), we should heed the "longstanding principle of construing ... lingering ambiguities in deportation statutes in favor of the alien." *Cardoza–Fonseca,* 480 U.S. at 449, 107 S.Ct. at 1222.

H.R.Rep. No. 101–955, at 133 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6784, 6798 (emphasis added), and directed her to "take into account possible exceptions appropriate in the interest of justice." IMMACT 90, Pub.L. No. 101–649, 104 Stat. 4978, 5066, § 545(c).[18] Congress was not motivated by existing abuse to curtail sharply the availability of motions to reopen to petitioners such as the Shaars;[19] rather, it authorized such motions to be filed.

### C.

Finally, as the dissenting members of the BIA point out, there are alternative interpretations of Section 1252b(e)(2)(A) that are consistent with the statutory language and purpose and avoid unconstitutional and irrational results.

Most directly, motions to reopen may be treated as are appeals, and the grant of voluntary departure continued until the motion has been adjudicated. *See Contreras–Aragon,* 852 F.2d at 1094–95.

Alternatively, as suggested by the BIA's chairman, Section 1252b(e)(2)(A)'s exception for "exceptional circumstances" may be applicable: Barring a legitimate application for relief simply because the immigration judge fails to act within the period of voluntary departure is an exceptional circumstance "beyond the control of the alien." 8 U.S.C. § 1252b(f)(2). The statute does not define exceptional circumstances other than to provide they should be at least as compelling as those caused by serious illness or the death of an immediate relative. *See id.* Loss of a legitimate claim for relief from deportation and permanent separation from family in the United States are sufficiently compelling to justify invoking the exception.

Finally, consistent with our interpretation of statutes of limitations, and the INS' treatment of similar filing requirements, eligibility

for relief could be determined as of the date a motion to reopen is filed rather than the date it is adjudicated. *See Shaar,* 1996 WL 426889 (Guendelsberger, B.M., dissenting) (citing 8 C.F.R. § 245.1; 8 C.F.R. § 248.1). As suggested by the American Immigration Lawyers Association, as amicus before the BIA, the filing of a meritorious motion may be interpreted to toll the period for voluntary departure. Aliens would then be encouraged to file motions to reopen promptly, to maximize the period for voluntary departure left them should their motion be denied, but would not be penalized for delays beyond their control.

Each of these interpretations is consistent with Congress' intent to allow aliens with valid claims to reopen their deportation proceedings, and would avoid the absurd, arbitrary, and likely unconstitutional results that will follow from the interpretation adopted by the majority.

### IV.

Petitioners "stole a march" on no one. Majority op. at 955. Rather, they proceeded "in the orderly manner provided by law," Majority op. at 955, filing a motion to reopen authorized by Congress, during a voluntary departure period authorized by Congress, for suspension of deportation relief authorized by Congress. Their fatal deficiency was an inability to compel an immigration judge to act promptly on their motion. In no other context do we penalize an applicant for a tribunal's failure to act; we ought not do so here.

---

18. The Attorney General's report found little or no abuse of motions to reopen. Immigration judges surveyed "unanimously concluded that there was no pattern of abuse." *See* Attorney General's Report to Congress on Consolidation of Requests for Relief from Deportation, *reported in* 68 Interpreter Releases 907, 908 (July 22, 1991).

19. Congress rejected language from a bill introduced by Congressman Lamar Smith, which would have limited motions to reopen in all situations. *See* Iris Gomez, *The Consequences of Nonappearance: Interpreting New Section 242B of the Immigration and Nationality Act,* 30 San Diego L.Rev. 75, 123 (1993).